**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**June 30, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

UTAH POLITICAL WATCH, INC.;
BRYAN SCHOTT,

     Plaintiffs - Appellants,

v.

ALEXA MUSSELMAN, Utah House of
Representatives Communications Director
and Media Liaison Designee; ANDREA
PETERSON, Utah Senate Deputy Chief of
Staff and Media Liaison Designee; ABBY
OSBORNE, Utah House of
Representatives Chief of Staff; MARK
THOMAS, Utah Senate Chief of Staff, in
their official and individual capacities,

     Defendants - Appellees.

-----------------------------------------------------

AMERICAN CIVIL LIBERTIES UNION
OF UTAH FOUNDATION;
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION;
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS,

     Amici Curiae.

No. 25-4124

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:25-CV-00050-RJS)**
_____

Charles Miller, Institute for Free Speech, Washington, D.C. (Robert P. Harrington, Kunzler Bean & Adamson, PC, Salt Lake City, Utah, with him on the briefs) for Plaintiffs-Appellants.

Daniel M. Vitagliano, Consovoy McCarthy PLLC, Arlington, Virginia (Julius Kairey, Consovoy McCarthy PLLC, Arlington, Virginia; Tyler R. Green, Consovoy McCarthy PLLC, Salt Lake City, Utah; and Victoria Ashby, Christine R. Gilbert and Alan R. Houston, Office of Legislative Research & General Counsel, Salt Lake City, Utah, with him on the brief) for Defendants-Appellees.

Jason M. Groth and Masami T. Kanegae, ACLU of Utah Foundation, Salt Lake City, Utah, filed an Amicus Curiae Brief of the American Civil Liberties Union of Utah Foundation.

Katie Townsend, Gibson, Dunn & Crutcher LLP, Los Angeles, California; Connor P. Mui, Gibson, Dunn & Crutcher LLP, Washington, D.C.; and Peter Jacobs, Gibson, Dunn & Crutcher UK LLP, London, EC4Y 0HB, United Kingdom, filed an Amicus Curiae Brief of the Foundation for Individual Rights and Expression and the Reporters Committee for Freedom of the Press.

_____

Before **TYMKOVICH**, **MURPHY**, and **BACHARACH**, Circuit Judges.

_____

**TYMKOVICH**, Circuit Judge.

_____

The Utah Legislature opens its legislative sessions to the public so that its constituents may observe the state's lawmaking process. The Legislature also grants additional access to professional journalists through what it calls its Capitol Media Access and Credentialing Policy. Beyond what the Legislature affords the public, credentialed journalists receive perks such as entry to a press room and secure areas of the Capitol, use of designated media workspaces in the Senate and House galleries, and access to media availabilities and press events with elected officials. To be eligible for a credential, a journalist must be "part of an established reputable news

2

organization" and "[a]dhere to a professional code of ethics."  App., Vol. I at 68.
The policy categorically excludes journalists associated with "[b]logs, independent
media or other freelance media" from receiving a credential.  *Id.*

Bryan Schott is a journalist who covered the state house for more than twenty-
five years on behalf of various institutional media companies, including Salt Lake
City's most prominent newspaper.  The Legislature granted media credentials to
Schott each year that he worked for these companies.  But in 2025, after Schott left
the newspaper and started his own independent news organization—Utah Political
Watch—while continuing to report on state politics and legislature matters, the
Legislature denied his credential application.

Schott challenged the policy by suing various legislative officials who
administered it.  He alleged the policy was unconstitutional for facial and as-applied
viewpoint discrimination prohibited by the First Amendment, along with various
other constitutional claims.  The district court dismissed all his claims.

We **AFFIRM** in part and **REVERSE** in part.  The district court erred in
dismissing Schott's viewpoint discrimination claims.  On his as-applied viewpoint
challenge, he plausibly alleged that the Legislature denied his application because of
his news stories' viewpoints.  We also conclude the district court erred in dismissing
Schott's facial viewpoint claim because it incorrectly found he failed to allege
infringement of protected speech.  We remand to the district court for it to address
whether the policy on its face is viewpoint-based.  On the remaining claims—

3

retaliation, prior restraint, and vagueness—the district court did not err in dismissing them.

# I.    Background

## A.    *Factual Background*[1]

Utah's legislative session runs from late January to early March and is generally open to the public. The State, however, also created designated areas throughout the Capitol for media members to more conveniently cover the Legislature's session. The Legislature began to require media credentials in 2013 for journalists to access those areas, and in 2018, it adopted a written credentialing policy. Early versions of the policy did not categorically exclude independent media. For example, the 2019 policy permitted "a blog site owner or organization not bound by a code of ethics" to receive a credential by "sign[ing] a document stating they will abide by the journalistic code of ethics." App., Vol. I at 49. In 2021, the Legislature updated the policy to require the applicant to "[r]epresent an established, reputable news organization or publication." *Id.* at 54. The 2021 policy did, however, state that "[b]loggers representing a legitimate independent news organization may become credentialed under some circumstances." *Id.* at 55. The Legislature altered its 2023 and 2024 policies to be more restrictive on independent media by stating that

---

[1] We set forth the facts as alleged in Schott's Amended Complaint, its exhibits, and documents incorporated by reference therein. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) ("In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits and documents incorporated into the complaint by reference." (internal citations omitted)).

"[b]loggers representing a legitimate independent news organization may become credentialed under *limited, rare circumstances*." *Id.* at 62, 66 (emphasis added).

Bryan Schott is a professional journalist who has reported on Utah politics for more than two decades. He is a member of the Society of Professional Journalists and abides by its code of ethics. Schott has received many national and local awards for his reporting. He has covered Utah's Legislature since 1999 and previously worked at news organizations such as UtahPolicy.com and The Salt Lake Tribune. Schott held a media credential each year that the Legislature issued them through the 2024 legislative session.

During the 2024 legislative session, Schott "produce[d] news content critical of the Utah Legislature or its leaders." *Id.* at 37. For example, after Schott wrote an article criticizing Utah House Speaker Mike Schultz for dodging questions, Schultz sent Schott messages accusing him of bias and stated, "You used to be the best reporter in the Legislature. It's sad how far you've fallen." *Id.* at 21. On another occasion, after Schott made a social media post "poking a little fun" at legislative staffers who struggled to set up a backdrop, Abby Osborne, the Chief of Staff for the Utah House of Representatives, publicly replied:



Abby Osborne
@MsAbbyOsborne

Bryan, you are a dick! As a reporter, I can't believe you think it's okay to blast staff for doing their job. You could have got up and helped, but you chose to just tweet about it. #classless

8:23 AM · Jan 11, 2024 · 3,827 Views

*Id.* at 22.

In September 2024, after leaving The Salt Lake Tribune, Schott founded Utah Political Watch (UPW). Schott is UPW's owner, publisher, sole reporter, and Editor-in-Chief. UPW is a news service that covers Utah politics and operates as a limited liability corporation. It offers free newsletters covering Utah politics as well as subscription-based content. UPW carries two million dollars in media liability insurance. Because Schott is UPW's sole reporter and its Editor-in-Chief, no one substantively edits his stories. UPW does, however, employ Schott's wife as his copyeditor to help with stylistic edits, story selection, and writing headlines. UPW's website receives tens of thousands of visitors each month and Schott's top stories usually receive thousands of views. UPW also produces a podcast in which Schott discusses Utah political news.

At some point after Schott left The Salt Lake Tribune, his former employer notified the Legislature that Schott was no longer affiliated with the organization. *See* App., Vol. I at 77. Schott alleged the Legislature then "revoked [his 2024] credentials" even though the 2024 policy did not yet categorically exclude blogs and independent media. *Id.* at 35.

In November 2024, the Legislature again revised its media credentialing policy in anticipation of the 2025 legislative session. The 2025 policy read:

> The Utah Capitol Media Credential application process . . . is designed to give professional journalists and media representatives from reputable organizations access to cover the Legislature and other significant events at the Utah State Capitol. This process aims to support informed reporting

while maintaining the integrity and security of the Capitol. . . .

\* \* \*

To apply for a Utah State Capitol Media Credential, an applicant needs to: . . .

- Be a professional member of the media (which includes journalists, photographers and videographers) who regularly covers the Legislature and Capitol in person and is part of an established reputable news organization or publication. . . .
  - o Blogs, independent media or other freelance media do not qualify for a credential. . . .
- Adhere to a professional code of ethics. . . .

\* \* \*

Credentials may be denied or revoked for any reason, such as the following: . . .

- Does not represent an established reputable news organization or publication.
- Does not regularly cover the Legislature in person at the Capitol.
- Fails to adhere to standards of professional conduct. . . .

*Id.* at 68–70.  If the Legislature denied credentials to an applicant, the applicant had

the right to appeal to the "Senate or House chief of staff."  *Id.* at 70.

The 2025 policy also stated that credentialed media had access to:

- [S]ome secure areas of the Capitol, such as the press room and designated areas in the Senate and House chambers . . . .
- [D]esignated media workspaces in the Senate and House galleries. . . .
- [M]edia availabilities and other press events with elected officials. . . .
- [D]esignated media parking. . . .

7

- [T]he Capitol press room, which is equipped with internet access and an audio feed from both chambers. . . .

*Id.* at 69.

On December 12, 2024, Schott reported for UPW that a local nonprofit had filed an ethics complaint accusing Utah Senate President Stuart Adams of violating campaign disclosure laws.  Adams criticized Schott's story on social media:



President J. Stuart Adams ✔
@JStuartAdams

Earlier today, former media member Bryan Schott published a blog post that failed to include information from the Lt. Governor's Office or those named in the story before publishing the blog. Unfortunately, this is not the first time this has occurred; it is part of a troubling pattern of neglectful journalism that undermines the profession's integrity, which is one of the cornerstones of our republic.

As someone who claims to be a journalist, it is disappointing to see such a lack of professionalism. Sending a request for comment and immediately publishing the story is irresponsible and reflects a disregard for accurate reporting. The story is not only misleading but factually inaccurate.

Had he taken the time to get facts from the Lt. Governor's Office or allowed those named in the blog a chance to respond, he would have learned that the information was accurately reported and in compliance with the statute with no attempt to skirt the law. Instead, he published an inaccurate and misleading blog that omits critical details and essential context.

*Id.* at 22.  The Utah Senate's official social media page also posted Adams's statement but later removed it.

In text messages discussing the story, Andrea Peterson, the Utah Senate Deputy Chief of Staff and Media Liaison Designee, referred to Schott as "someone who claims to be a journalist" and accused him of "lack[ing] professionalism[,] . . .

journalistic ethics[,] . . . [and] journalistic integrity," "disregard[ing] accurate reporting and ethical standards," writing a "misleading" and "factually inaccurate" story, and engaging in "a troubling pattern of neglectful journalism." *Id.* at 73–75. Schott replied to Peterson, "It certainly sounds like you're going to use your criticism of this story you don't like to deny me a press credential next week." *Id.* at 73. Peterson responded, "We will follow our policy when reviewing media credential applications." *Id.*

 On December 17, 2024, Schott applied for a media credential. Soon after, Alexa Musselman, the Utah House of Representatives Communications Director and Media Liaison Designee, emailed Schott informing him the Legislature denied his application because "Utah Capitol media credentials are currently not issued to blogs, independent, or other freelance journalists." *Id.* at 24.

Schott appealed, and on December 26, 2024, he received a letter from Osborne and Mark Thomas, the Chief of Staff for the Utah Senate, upholding the denial. The letter stated:

> The media liaison designees reviewed your recent submission and determined that the organization you named in your application, Utah Political Watch, was a blog, independent media outlet, or freelance media and therefore did not qualify for credentialing. This decision is consistent with the policy authorizing established, reputable news organizations, such as the Salt Lake Tribune, and prohibiting blogs, independent media outlets or freelance media. . . .
>
> Any claim that recent updates to the policy were intended to prevent targeted individuals from obtaining credentials is inaccurate and completely unfounded.

9

> Finally, nothing prevents individuals from reporting on the proceedings of the Utah Legislature, regardless of whether they hold a media credential.  The Utah Legislature is dedicated to maintaining a transparent government, and the Capitol is open to all.  Committee meetings, legislative floor debates, agenda items and materials are readily accessible on the legislative website, and everyone is welcome to attend committee meetings and floor time.

*Id.* at 77–78.

Upon Schott's request, the Legislature provided him with a list of news organizations that it granted or denied media credentials to between 2021 and 2025.  Relying on that list, Schott alleged the Legislature applied its policy inconsistently and targeted him for disfavored treatment.  For example, Schott alleged Utah News Dispatch received a media credential for the 2024 session despite at the time being only "a month-old organization."  *Id.* at 23.  He also alleged the Legislature issued a credential for the 2025 session to a reporter from Building Salt Lake, a self-described "locally owned, independent media."  *Id.* at 25.  Schott claimed that when he filed his complaint, Building Salt Lake's website described itself as "a nationally recognized Top-100 Urban Planning Blog."[2]  *Id.*  And Schott further alleged the Legislature

---

[2] At oral argument, the Legislature argued that the Building Salt Lake web address Schott cited in his complaint does not contain a quote describing itself as a "blog."  *See* App., Vol. I at 25 (citing *About*, Building Salt Lake, https://buildingsaltlake.com/about/).  The Legislature is correct that the webpage does not *currently* describe itself as a blog.  But it is reasonable to infer that the webpage did so at the time Schott filed his complaint, and Building Salt Lake has since updated it.  The webpage now states, "Building Salt Lake is a nationally recognized Top-100 Urban Planning *Source* . . . ."  *About*, Building Salt Lake, https://buildingsaltlake.com/about/ [https://perma.cc/KMA6-Y78K] (last visited Apr. 21, 2026) (emphasis added).  But that statement is linked to another website that lists Building Salt Lake (#28) among the "Best Urban Planning *Blogs* . . . ."  *100 Best*

issued credentials "to reporters from multiple organizations that call themselves independent, including Building Salt Lake, Gephardt Daily, The Salt Lake Tribune, Utah Policy, and Utah News Dispatch." *Id.*

Schott also cited in his complaint a Declaration from Musselman in which she further explained the Legislature denied his 2025 session application because he "is not responsible to an editor and is the final arbiter and executioner of his stories, and thus represents his own stream of consciousness." *Id.* at 26. Schott, however, alleged the Legislature did not consistently apply its purported requirement that an applicant be responsible to an editor. For example, he claimed the Legislature granted credentials "to Becky Ginos," who "is the editor and sole staff member of the Davis Journal." *Id.* at 27 (citing *About Us*, The City Journal, https://www.davisjournal.com/pages/about-us). Schott also alleged the Legislature "issued a press credential to Holly Richardson, the editor and sole employee of Utah Policy." *Id.* (citing *About*, Utah Policy, https://utahpolicy.com/about).

Schott further alleged that without a media credential he was unable to personally attend and ask questions at several legislative press conferences for the 2025 session. He also claimed that without a credential he was unable to attend various media availabilities with elected officials.

---

*Urban Planning Blogs to Follow in 2026*, FeedSpot (Apr. 20, 2026), https://bloggers.feedspot.com/urban_planning_blogs/ [https://perma.cc/KU9M-N66J] (emphasis added). At this preliminary stage we draw "all reasonable inferences in favor of the non-moving party," and we conclude Schott's plausible factual allegation about Building Salt Lake is not contradicted by the webpage. *See Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017).

### B.    Procedural Background

Schott sued in the District of Utah on January 22, 2025, asserting four claims under 42 U.S.C. § 1983.  He challenged the constitutionality of the 2025 policy and sought declaratory and injunctive relief.  Schott named Musselman, Peterson, Osborne, and Thomas as defendants, in their individual and official capacities.  He argued Musselman and Peterson violated the First and Fourteenth Amendments by refusing to grant him a credential, and he argued Osborne and Thomas likewise violated those amendments by denying his appeal.  Schott also filed a motion for a temporary restraining order seeking to require the Legislature to issue him a credential for the ongoing 2025 legislative session.

After a hearing, the district court denied Schott's motion for a TRO and granted him leave to amend his complaint.  Schott filed his operative Amended Complaint on February 26, 2025, along with a motion for a preliminary injunction.  Schott challenged the policy with five § 1983 claims under the First and Fourteenth Amendments: (1) as-applied viewpoint discrimination; (2) facial viewpoint discrimination; (3) retaliation; (4) prior restraint; and (5) vagueness.

The Legislature subsequently moved to dismiss Schott's claims.  The district court dismissed all five counts and denied Schott's preliminary-injunction motion as moot.  Schott appealed.

## II.    Discussion

Schott contends that the district court erred in dismissing his complaint and denying his motion for a preliminary injunction as moot.  We review a district court's

Rule 12(b)(6) dismissal de novo. *See Green Room LLC v. Wyoming*, 157 F.4th 1196, 1205 (10th Cir. 2025). "We must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotation marks omitted). We must then determine whether those "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). We do not "weigh potential evidence that the parties might present at trial"; we "assess whether the plaintiff's complaint *alone* is legally sufficient to state a claim for which relief may be granted."[3] *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (emphasis added) (quotation marks omitted). *See also Alvarado*, 493 F.3d at 1215 ("[A] court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss . . . .").

### A.     As-Applied Viewpoint Discrimination

Schott's central claim is that the Legislature discriminated against him based on the views he expressed in his reporting when it denied him a credential for the

---

[3] In its ruling, the district court relied on individual defendants' declarations attached to the Legislature's motion to dismiss. *See, e.g.*, App., Vol. II at 247 n.16 (citing Declaration of Andrea Peterson). To justify that reliance, the district court cited precedent allowing a court to consider evidence outside the complaint when a defendant brings a factual attack under Rule 12(b)(1). *See id.* at 246 n.3 (citing *Bell Helicopter Textrox, Inc. v. Heliqwest Int'l, Ltd.*, 385 F.3d 1291, 1295 (10th Cir. 2004)). But those precedents are inapplicable to this Rule 12(b)(6) challenge. To the extent that the district relied on evidence outside the complaint to dismiss Schott's claims, we must reverse unless "any error on the part of the district court in not excluding [the Legislature's evidence] from the motion to dismiss was harmless." *Alvarado*, 493 F.3d at 1216.

13

2025 legislative session.[4] "The Supreme Court has articulated a three-step framework to be used when analyzing restrictions on private speech on government property." *Wells v. City and County of Denver*, 257 F.3d 1132, 1138 (10th Cir. 2001) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)). "First, the court must determine whether the speech at issue is protected by the First Amendment." *Id.* "If so, the court must then 'identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic.'" *Id.* at 1138–39 (quoting *Cornelius*, 473 U.S. at 797). "Third, the court 'must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard . . . .'" *Id.* at 1139 (quoting *Cornelius*, 473 U.S. at 797). The requisite standard in this case requires the policy to be both reasonable and viewpoint neutral. *See Cornelius*, 473 U.S. at 806.

Before addressing whether the speech at issue is protected by the First Amendment, we first consider the nature of the forum that Utah created under the media credentialing policy because it informs our analysis of the first prong. Schott

---

[4] Schott also asserts under this claim that the Legislature's policy discriminates "on the basis of content . . . as applied" to him. App., Vol. I at 34. "A content-based regulation 'target[s] speech based on its communicative content,' restricting discussion of a subject matter or topic." *Vidal v. Elster*, 602 U.S. 286, 292–93 (2024) (alteration in original) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). But in both a limited public forum and a nonpublic forum, the government may engage in "content discrimination . . . if it preserves the purposes of that limited forum . . . ." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). In any event, because we conclude the district court erred in dismissing Schott's as-applied viewpoint challenge we need not address Schott's allegation of as-applied content discrimination.

alleges Utah's policy has created a limited public forum. Limited public forums are tangible or intangible spaces the government opens to "certain groups or for the discussion of certain topics." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). The Legislature asserts its policy is instead a nonpublic forum but acknowledges the difference between the two forums is immaterial because the legal standards are the same. A nonpublic forum is "where the government is acting as a proprietor, managing its internal operations." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (quotation marks omitted).

We need not decide between whether Utah's credentialing policy created a limited public forum versus a nonpublic forum.[5] We resolve this appeal by concluding the policy formed one or the other because in either forum the legal standard is the same: In both limited public and nonpublic forums, speaker-based speech restrictions must be both viewpoint neutral and "reasonable in light of the purpose served by the forum . . . ." *Cornelius*, 473 U.S. at 806; *see also Rosenberger*, 515 U.S. at 829.

Next, we turn to whether the policy impinges on protected speech.

---

[5] Other circuits have found similar credentialing schemes, such as "the White House Press Area," to be nonpublic forums because the government maintained "selective access for individual speakers" inside a government building. *Ateba v. Leavitt*, 133 F.4th 114, 121–22 (D.C. Cir. 2025) (quotation marks omitted); *see also John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 610 (7th Cir. 2021) (concluding "a limited-access press conference" was "a non-public forum"). *But see TGP Commc'ns, LLC v. Sellers*, No. 22-16826, 2022 WL 17484331, at *4, 6 (9th Cir. Dec. 5, 2022) (press policy created a *limited* public forum).

### 1. *Protected Speech*

The district court construed that at "the heart of [Schott's viewpoint discrimination] claims is an assertion of an unequivocal right to gather news." App., Vol. II at 255. It cited our decision in *Smith v. Plati* to conclude that "'there is no general First Amendment right of access to all sources of information within governmental control,' and the press does not have a 'special right of access to government information not available to the public.'" *Id.* at 257 (quoting *Smith v. Plati*, 258 F.3d 1167, 1178 (10th Cir. 2001)). To dismiss Schott's claim that the policy denies him access equal to the rights of other credentialed media, the district court again relied on *Smith* to conclude that "the First Amendment does not encompass a right to 'resources . . . routinely given to other media . . . .'" *Id.* at 258 (quoting 258 F.3d at 1177–78). The district court accordingly held Schott failed to allege infringement of protected speech and dismissed both viewpoint discrimination claims on that basis.

We disagree with this assessment of the right Schott seeks to vindicate. Schott asserts neither a right to newsgathering nor a right of equal access to all information the Legislature provides other media. Rather, he alleges the Legislature blocked his access to a government-created forum because of his viewpoint. *See* App., Vol. I at 31 (alleging the policy created a "limited public forum" and "[the Legislature] cannot deny [him] equal access to media designated areas or editorial discretion unless the 2025 Credential Policy is reasonable in light of the forum's purpose and viewpoint neutral"). A right to such access is well-established. *See, e.g.*, *Perry Educ. Ass'n v.*

16

*Perry Loc. Educators' Ass'n*, 460 U.S. 37, 48 (1983) (explaining that by forming "a 'limited' public forum" the government creates a "constitutional right of access" that "extend[s] to other entities of a similar character").

Our decision in *Smith v. Plati* does not control this case because the plaintiff there asserted different rights and, unlike Schott, did not allege the government had created a limited public or nonpublic forum. In that case, Smith operated a non-profit website dedicated to covering the University of Colorado's athletic teams. *Smith*, 258 F.3d at 1172. Smith alleged the University believed his website was "in some way in competition with [the University's own] website," so it did "everything possible to interfere" with his ability to gather news concerning the school's athletic teams. *Id.* Smith alleged the University barred him from various athletic facilities, denied him Athletic Department resources "routinely given to other media," and denied him "treatment as 'media' or 'press.'" *Id.* Smith asserted two claims relevant here. *First*, he alleged that there was "some sort of right to newsgathering" protected by the First Amendment, which "the University violated by declining to provide him certain *information* about its varsity athletic programs." *Id.* at 1177 (emphasis added). We rejected that claim because there is no constitutional "right of access to University athletic information . . . as a member of either the public or the press." *Id.* at 1178. *Second*, Smith sought mandamus under Colorado law requiring the University to give him "equal access to all *information* given to other members of the press." *Id.* (emphasis added). We held that "under Colorado law mandamus does not

17

lie to compel [the University] to treat Smith like all other members of the media." *Id.* at 1179.

Schott's claims are distinguishable. Unlike Smith, who asserted a "right of access to news sources," *id.* at 1178 (quotation marks omitted), Schott does not assert a broad right to newsgathering. And unlike Smith's mandamus claim for "equal access" to the same *information* that the University provided to other media members, *id.*, Schott merely seeks access to a state-created *forum* under reasonable and viewpoint-neutral criteria. Further, in *Smith* we did not consider whether the University had created a government forum. *Smith v. Plati* is therefore inapt.

Moreover, at least four other circuits have recognized the same protected speech Schott seeks to vindicate. The Second, Seventh, Ninth, and D.C. Circuits have each concluded that if the government opens government property to the press, it cannot deny access to only some journalists based on their views. *See, e.g.*, *Am. Broad. Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977) ("[O]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable."); *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 610 (7th Cir. 2021) ("[T]he government may regulate access [to a press conference] provided the regulations are reasonable and 'not an effort to suppress expression merely because public officials oppose the speaker's view.'" (quoting *Perry Educ. Ass'n*, 460 U.S. at 46)); *TGP Commc'ns, LLC v. Sellers*, No. 22-16826, 2022 WL 17484331, at *6 (9th Cir. Dec. 5, 2022) ("While reporters do not

have an unrestricted right to go where they please in search of news, the elimination of some reporters from an area which has been voluntarily opened to other reporters for the purpose of news gathering presents a wholly different situation." (citation modified)); *Associated Press v. Budowich*, No. 25-5109, 2025 WL 1649265, at *1 (D.C. Cir. June 6, 2025) ("Because the White House has opened these press facilities to all bona fide Washington-based journalists, hard passes may not be denied arbitrarily or based on the content of a journalist's speech." (internal quotation marks omitted)); *Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020) ("The denial of a hard pass, implicates important first amendment rights." (citation modified)).

The Legislature, however, responds that the Fourth Circuit has rejected a "right of 'equal access'" among the press. Aple. Br. at 21. Recognizing such a right, the Legislature argues, would "confer[] a privileged First Amendment status on the press" because it "would require that, in each and every circumstance where the government made news available, it would have to give access to that *information* to *everyone* on equal terms." *Id.* (first emphasis added) (quoting *Snyder v. Ringgold*, 133 F.3d 917, 1998 WL 13528, at *4 (4th Cir. 1998) (unpublished)). "Accepting [Schott's] theory 'would plant the seed of a constitutional case in virtually every interchange between public official and press'" because "'[p]ublic officials routinely select among reporters when . . . providing access to nonpublic *information*.'" *Id.* at 22 (emphasis added) (quoting *The Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 417–18 (4th Cir. 2006)).

19

But the Legislature mistakes what is at issue.  Schott is not alleging a broad right of equal access to government *information*, he is seeking viewpoint-neutral access to a government-created forum for journalists.  The Fourth Circuit cases the Legislature cites are thus inapplicable here.[6]

Additionally, in making its slippery slope argument, the Legislature misunderstands the nature of a limited public or nonpublic forum.  In such forums, the government *necessarily* (and permissibly) restricts speaker access by discriminating based on *content* to further the forum's purpose.  *See Rosenberger*, 515 U.S. at 829.  Here, the Legislature restricts speaker access on the basis of content by granting media credentials to only *political* journalists.  But in such forums, the government cannot engage in viewpoint discrimination.  *See Cornelius*, 473 U.S. at

---

[6] The Legislature also argues the Fourth Circuit in *Ehrlich* and the Seventh Circuit in *Evers* rejected a journalist's alleged right to "equal access."  Aple. Br. at 22.  But neither case stands for that proposition.  *Ehrlich* did not address what was a cognizable injury for a viewpoint-based challenge to a media credentialing policy but considered a claim for retaliation unrelated to forum analysis.  437 F.3d at 416; *see also Ateba*, 133 F.4th at 120 ("Relying on [*Ehrlich*], the government argues that withdrawing preferential access to government property or providing less access for some reporters to cover government officials does not implicate the First Amendment.  But [*Ehrlich* did] not address [a] facial First Amendment challenge[] to a regulatory scheme, and instead consider[ed] claims of retaliation for protected activity." (internal citations omitted)).  And although the Seventh Circuit in *Evers* did reject the plaintiff's broad "equal access" theory "that *any* restriction on someone acting as a member of the press must be subject to strict scrutiny," it also concluded the press event was a nonpublic forum where the government could not engage in viewpoint discrimination as a means of selective access.  994 F.3d at 609, 612 (emphasis added).  Accordingly, neither case clashes with the protected speech Schott seeks to vindicate here.

806. For example, the Legislature could not grant credentials only to political journalists with a *conservative ideology*.

The Legislature also disputes that Schott is harmed by being denied access to the forum. It argues that its denial of a credential to Schott imposes only a *de minimis* burden on him because it does not hinder his ability to report on the legislative session; thus, Schott has not alleged infringement of protected speech. As the Legislature puts it, "Schott maintains complete 'access to sources of information available to members of the general public' even without a credential." Aple. Br. at 16 (quoting *Pell v. Procunier*, 417 U.S. 817, 835 (1974)). But Schott alleges otherwise. He says that without a press credential he does not have "the same news gathering opportunities as are afforded to his *colleagues in the media*." App., Vol. I at 29 (emphasis added). The policy itself states that credentialed media enjoy privileges, such as access to "some secure areas of the Capitol," "the press room," and to "media availabilities and other press events with elected officials." *Id.* at 69. The public has no access to such areas and events.

The Legislature, however, argues that many media events that Schott alleges he cannot attend in person are nevertheless available online via live streams, and thus "Schott can freely gather without a credential the same news on the Legislature for his reporting that he could with a credential." Aple. Br. at 18–20. But as the Ninth Circuit persuasively observed, "watching the press conference live streams, rather than attend[ing] in person, [is not] a 'de minimis' harm . . . ." *TGP Commc'ns*, 2022 WL 17484331, at *6. The obvious problem is that Schott cannot ask legislative

21

officials questions without attending press conferences in person. Taking Schott's factual assertions as true at this stage of litigation, it is plausible that without a media credential his ability to gather news is meaningfully diminished compared to his credentialed colleagues.

At bottom, the Legislature's denial of a credential to Schott implicates his constitutional right to access either a limited public or nonpublic forum free from viewpoint discrimination. This is core protected First Amendment speech.

### 2. *Viewpoint Discrimination*

"When government creates [a limited public or nonpublic] forum, in either a literal or metaphysical sense, some content- and speaker-based restrictions may be allowed, . . . [but] viewpoint discrimination is forbidden." *Matal v. Tam*, 582 U.S. 218, 243 (2017) (internal citations and quotation marks omitted). Viewpoint discrimination is a "more blatant" and "egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. "A viewpoint-based regulation targets not merely a subject matter, but particular views taken by speakers on a subject." *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (internal quotation marks omitted). Viewpoint discrimination occurs when the government singles out speech "based on the specific motivating ideology or the opinion or *perspective* of the speaker," *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) (emphasis added) (internal quotation marks omitted), or "distinguishes between two opposed sets of ideas," *Iancu v. Brunetti*, 588 U.S. 388, 394 (2019).

When assessing an as-applied viewpoint challenge, we move past the facial validity (or invalidity) of the government regulation and "look to the government's purpose as the threshold consideration." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994). "The government may not regulate [speech] based on hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992). As a result, we ask whether the Legislature "appl[ied] the policy in this case to [Schott] on the basis of [his] viewpoint." *Hawkins v. City and County of Denver*, 170 F.3d 1281, 1288 (10th Cir. 1999).

Other circuits have found as-applied viewpoint discrimination when the government denied press credentials to a journalist because it determined the journalist did not "seek the truth" in his reporting. *TGP Commc'ns, LLC v. Sellers*, No. 22-16826, 2022 WL 17484331, at *5 (9th Cir. Dec. 5, 2022). *See also Associated Press v. Budowich*, No. 25-5109, 2025 WL 1649265, at *1, 13 (D.C. Cir. June 6, 2025) (declining to stay a preliminary injunction against the government's exclusion of the AP from the East Room of the White House, a nonpublic forum, due to the AP's "use [of] the name Gulf of Mexico in its Stylebook, rather than the President's preferred Gulf of America"). In *TGP Communications*, the Ninth Circuit granted a motion for an injunction pending appeal for a journalist's as-applied claim that Maricopa County, Arizona denied him a press pass because of his viewpoints.[7]

---

[7] The Ninth Circuit did "not address [Appellants'] facial challenge" because it "conclude[d], at this preliminary juncture, that Appellants are likely to succeed on their First Amendment as-applied challenge . . . ." *TGP Commc'ns*, 2022 WL 17484331, at *3.

The County originally denied the press pass because it concluded the journalist did not meet the policy requirements of "journalistic integrity" and being a "bona fide correspondent of repute in [his] profession." *TGP Commc'ns*, 2022 WL 17484331, at *2 (alteration in original). "But despite these stated reasons," the Ninth Circuit found "the evidence . . . strongly suggests that a predominant reason for the County denying Plaintiffs a press pass was Conradson's political views." *Id.* at *4. In denying the press pass, County officials criticized the journalist by stating he did not "seek the truth" in his reporting, he "use[d] inflammatory and/or accusatory language, such as 'Fake News Media,'" and his reporting "lack[ed] the journalistic integrity and credibility required by the Press Pass criteria." *Id.* at *5. The Ninth Circuit held, "It is the County's politically-tinged assessment of Conradson's prior reporting that appears to have led it to deny him a press pass." *Id.*

Schott alleges the Legislature denied him a credential because of the critical views he expressed in his reporting on members of the Legislature. The Legislature contends that Schott's claim of as-applied discrimination is "based only on [his] allegations that his reporting angered [its policy decisionmakers]." Aple. Br. at 30. This, the Legislature argues, is insufficient because "temporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive." *Id.* (quoting *Trant v. Oklahoma*, 754 F.3d 1158, 1170 (10th Cir. 2014)). But Schott has alleged more than mere temporal proximity. On top of alleging that (1) legislative officials publicly and privately expressed their distaste and contempt for his reporting, Schott also alleges that (2) the

24

Legislature applied the policy inconsistently by credentialing journalists from some blogs and independent media that are similar to UPW, but denying his application, and (3) the Legislature revised the policy to categorically exclude blogs and independent media right after it revoked his credential and he started UPW. These are not conclusory allegations. After crediting their veracity, we conclude it is plausible the Legislature denied Schott's credential application because of his views.

To be sure, the Legislature contests many of Schott's allegations. But at the motion-to-dismiss stage, we accept Schott's factual assertions as true, and we do not consider the Legislature's factual arguments or its submitted evidence even if it appears to contradict Schott's allegations. *See Alvarado*, 493 F.3d at 1215.

For example, the Legislature argues that "[Schott's] exchanges with Defendants and legislative leadership" do not support his as-applied claim because "Schott alleges no viewpoints expressed" in his reporting that angered the legislative officials. Aple. Br. at 30–31. But viewpoint covers more than an individual's ideology or ideas on a particular subject matter—viewpoint includes the perspective of the speaker and how he speaks. *See Reed*, 576 U.S. at 168; *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) ("[T]he First Amendment protects the inalienable right of every individual to decide for himself *how* best to speak." (emphasis added) (internal quotation marks omitted)). We "use the term 'viewpoint' discrimination in a broad sense"; government action that applies "evenhandedly" to "both sides of every possible issue" may still be viewpoint-based if it discriminates against the *way* in which a speaker communicates his ideas. *Matal*, 582 U.S. at 243.

25

Schott alleged that legislative officials expressed displeasure with the substance of his reporting as well as the way he reported the news: they criticized him for lacking ethical standards, engaging in inaccurate reporting, lacking professionalism, and not being a real journalist or media member. These factual allegations are similar to the County's "politically-tinged assessment of [the journalist's] prior reporting" in *TGP Communications*, where the government accused the journalist of lacking "journalistic integrity and credibility" and "us[ing] inflammatory and/or accusatory language[.]" 2022 WL 17484331, at *5. Schott's allegations plausibly show "that a predominant reason for the [Legislature] denying [him] a press [credential] was the viewpoint expressed in his writings." *Id.* We agree with the Ninth Circuit that this "type of viewpoint-based discrimination is exactly what the First Amendment protects against." *Id.*

To dispute Schott's allegations of inconsistent application, the Legislature explains *why* it granted credentials to other journalists that have similar editorial structures to UPW. For instance, the Legislature argues that even though Utah News Dispatch calls itself "independent" it is not "independent media" under the policy because it is affiliated with another media organization. Aple. Br. at 33. The Legislature also argues that Schott's allegations that credential holders from Davis Journal and Utah Policy are self-edited like him, are insufficient because he did not allege supporting facts "concerning those entities' editorial structure, oversight, or practices." *Id.* at 33–34.

26

And finally, the Legislature contends the fact that it denied other "self-supervised applicant[s] like Schott" demonstrates it did not deny his application because of his views. *Id.* at 34. But the Legislature is merely seeking to contradict Schott's factual allegations.[8] Schott alleges the Legislature granted credentials to other journalists that are independent and self-edited—the truth of whether those comparators are *actually* "blogs" or "independent media" under the policy are factual questions not up for debate at the motion-to-dismiss stage.

As for Schott's allegation that the Legislature altered its policy to target him, the Legislature argues the 2025 policy revision was merely "a continuation of prior limitations . . . ." Aple. Br. at 30 (quoting Supp. App. at 97). But that is a factual dispute and Schott has alleged otherwise. To dispute Schott's allegation, the Legislature quotes the district court's *factual* finding from the hearing on Schott's motion for a temporary restraining order. We do not consider the district court's factual findings from a TRO hearing when reviewing its Rule 12(b)(6) dismissal. *See Alvarado*, 493 F.3d at 1215; *Oxford House, Inc. v. Township of North Bergen*, 158 F.4th 486, 495–96 (3d Cir. 2025) ("[T]he denial of a preliminary injunction does not necessarily provide guidance as to what would be necessary for [a plaintiff] to sufficiently state a claim." (internal quotation marks omitted)).

---

[8] To the extent that the Legislature seeks to rely on Declarations that it filed with its motion to dismiss and opposition to Schott's injunction motion, we do not consider such outside evidence. *See Alvarado*, 493 F.3d at 1215.

Schott alleged that during the 2024 session, while he was working for The Salt Lake Tribune, various legislative officials criticized his reporting and qualifications. *See* App., Vol. I at 21–22. Then once he became an independent journalist, he alleged the Legislature revoked his 2024 credential—even though the 2024 policy did not yet categorically exclude blogs and independent media. *See* App., Vol. I at 66 ("Bloggers representing a legitimate independent news organization *may* become credentialed under limited, rare circumstances." (emphasis added)). After which the Legislature revised its policy to wholly exclude independent media like UPW. Considering these facts as true and in a light favorable to Schott, it is plausible the Legislature revised its policy to target him.

In sum, we conclude that Schott's well-pleaded factual allegations are sufficient to show the Legislature plausibly discriminated against him because of his viewpoints. The district court therefore erred in dismissing Schott's as-applied viewpoint discrimination claim, and we remand for further proceedings.

### B.    *Facial Viewpoint Discrimination*

Schott also argues that the policy is facially unconstitutional because it is both unreasonable and viewpoint-based.[9] He contends the policy discriminates based on

---

[9] Like his as-applied claim, Schott argues the policy also "discriminates against speech and press on the basis of *content* . . . on [its] face . . . ." App., Vol. at 34 (emphasis added). But as we noted, content discrimination is permissible in both a limited public forum and a nonpublic forum if it preserves the purposes of that forum. *See supra* n.4 (citing *Rosenberger*, 515 U.S. at 829). We thus direct the district court upon remand to also determine whether Schott's allegation of content discrimination is permissible under *Rosenberger*.

viewpoint because it allows the government to deny "credentials based on [a reporter's] use of editorial discretion to present [his] news pieces in a particular way," enabling it to "punish[] a media organization for not being affiliated with larger media organizations, or for" choosing not "to have an editor." App., Vol. I at 33. We evaluate his facial viewpoint claim under the same three-step framework as his as-applied challenge. *See Cornelius*, 473 U.S. at 797.

The district court dismissed Schott's facial claim at step one, just as it did for his as-applied challenge. But as we explained, Schott has adequately alleged the policy violates his right to access either a limited public or nonpublic forum which is protected speech under the First Amendment. Accordingly, the district court also erred in prematurely dismissing Schott's facial claim.

"When the district court has not reached a required issue, we typically permit that court to tackle the issue in the first instance." *Lyn M. v. Premera Blue Cross*, 966 F.3d 1061, 1070 (10th Cir. 2020). In accordance with that practice, we remand to the district court for it to determine whether the policy, on its face, is unreasonable or discriminates based on viewpoint. *See Rosenberger*, 515 U.S. at 829 ("Once it has opened a limited forum . . . [t]he State may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint." (internal citations and quotation marks omitted)).

### C.    *First Amendment Retaliation*

Schott also alleges the Legislature denied his credential application in retaliation for his critical reporting of various legislative officials. To survive a motion to dismiss a First Amendment retaliation claim, a plaintiff must plausibly allege that: (1) he "engaged in [a] constitutionally protected activity"; (2) the defendant's "actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) the defendant's "adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Trant*, 754 F.3d at 1169–70.

The Legislature does not dispute that Schott's allegation satisfies the first element because his critical reporting is a constitutionally protected activity. *See Baumgartner v. United States*, 322 U.S. 665, 673–74 (1944) (Frankfurter, J.) ("One of the prerogatives of American citizenship is the right to criticize public men and measures . . . ."). The district court, however, found that Schott's claim failed to satisfy the second element—that the Legislature's denial of a media credential would "chill a person of ordinary firmness" from continuing to engage in critical reporting of legislative officials. The district court concluded this since "[Schott] in fact reported on the 2025 legislative session without a media credential" and because members of the public without a credential can still observe the legislative session. App., Vol. II at 260.

We agree with the district court that Schott has not plausibly alleged objective chill under the second step. Schott's Amended Complaint merely alleges the

Legislature's denial of his credential application "would 'chill a person of ordinary firmness' from continuing to produce news content critical of the Utah Legislature or its leaders." App., Vol. I at 37. This is a conclusory allegation that is insufficient to plausibly overcome a motion to dismiss. *See Iqbal*, 556 U.S. at 678 ("[W]e are not bound to accept as true a legal conclusion couched as a factual allegation." (internal quotation marks omitted)). Further, Schott's own factual allegation that he continued to report on the Legislature without a credential undercuts his argument at step two.

Schott also argues the district court erred by assessing the "chilling effect" at step two under a *subjective* standard, rather than an objective one. *See Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007) ("[O]ur standard for evaluating th[e] chilling effect on speech is objective."). But courts may nevertheless consider a plaintiff's "persistence in maintaining his" speech as "evidence that [a defendant's] actions did not [objectively chill or] prevent such private speech." *Smith*, 258 F.3d at 1177; *see also Ehrlich*, 437 F.3d at 419 ("[T]he plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity." (quotation marks omitted)).

As a result, Schott's retaliation claim fails at step two. The district court correctly dismissed this claim.

### D.    *Prior Restraint*

Schott next raises a facial prior-restraint challenge against the policy by arguing its terms are so broad that they give the Legislature unbridled discretion to

31

deny a credential. He points to the policy's "reputable" and code of "ethics" requirements.

"A prior restraint on speech is a law, regulation or judicial order that suppresses speech . . . on the basis of the speech's content and in advance of its actual expression." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 42 (10th Cir. 2013) (quotation marks omitted). "[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988).

Schott's argument is attractive at first glance. Exclusionary terms in the policy like "reputable" and code of "ethics" are broad and require subjective judgments to apply. And although Schott does not rely on this language in his complaint, the policy's qualifier that "[c]redentials may be denied or revoked *for any reason*" also indicates the policy affords the Legislature unbridled discretion. App., Vol. I at 70 (emphasis added).

But a plaintiff may only raise a facial prior-restraint challenge against a licensing scheme when it regulates "*expressive activity*." *City of Lakewood*, 486 U.S. at 755 (emphasis added). "The law must have a close enough nexus to expression, or conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *Id.* at 759. "[L]aws of general application that are [(1)] not aimed at conduct commonly associated with expression and [(2)] do not permit licensing determinations to be made on the basis of ongoing expression or the

32

words about to be spoken, carry with them little danger of censorship." *Id.* at 760–61.

To determine whether a licensing scheme regulates expression or conduct commonly associated with expression, the relevant inquiry asks what action the challenged scheme regulates. Restrictions on speaking or distributing a message are susceptible to facial prior-restraint challenges. *See, e.g.*, *id.* at 769 (circulation restriction on newsracks); *Niemotko v. Maryland*, 340 U.S. 268, 272 (1951) (ordinance against speaking in a park without a license); *Flower v. United States,* 407 U.S. 197, 92 (1972) (restriction on leafleting); *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972) (ordinance restricting picketing). But restrictions on speaker *access* to government spaces—even if based on a speaker's message—are not; such licensing schemes are what First Amendment forum-based challenges are for. *See The Tool Box v. Ogden City Corp.*, 355 F.3d 1236, 1242–43 (10th Cir. 2004) (en banc); *Green v. U.S. Dept. of Justice*, 111 F.4th 81, 102–04 (D.C. Cir. 2024) (restriction "akin to a routine prohibition on trespass" was "not conduct closely associated with expression" because it regulated conduct "not necessarily associated with speech" and "applie[d] equally to would-be speakers" (internal quotation marks omitted)).

As we have explained, Utah's credentialing policy regulates access to a government-created forum. And although the policy might *implicate* speech by restricting Schott's right to access that forum, it does not directly *regulate*

33

expression.  While this is protected speech under Schott's forum-based viewpoint claims, it does not support a facial prior-restraint challenge under our precedents.

In *The Tool Box*, an en banc panel of this court found a city's building permitting scheme was not amenable to a facial prior-restraint challenge because it "lack[ed] the requisite nexus" to expression.  355 F.3d at 1242.  The plaintiff sought a building permit to open a nude-dancing establishment, but the city denied his application because his proposed establishment conflicted with the city's protective covenants that required the land to maintain a "wholesome" environment.  *Id.* at 1239.  The plaintiff argued that "wholesome" was such a vague standard that it conferred excessive discretion and was thus a prior restraint on his desire to promote constitutionally protected expression (nude dancing).  *Id.* at 1240–41.  We rejected his facial challenge because the law applied to "every business that seeks to locate in the Industrial Park" and the covenants were "not aimed at conduct commonly associated with expression . . . ."  *Id.* at 1242 (internal quotation marks omitted).

Like the permitting scheme in *The Tool Box*, the media credentialing policy is a law of general application: It applies to all journalists that seek a press credential.  And the policy does not regulate expression; it regulates *access* to a limited public or nonpublic forum.  It does not control "who may speak and who may not"—Schott is free to report whatever he wants with or without a credential.  *City of Lakewood*, 486 U.S. at 763.  And he may still speak in the Capitol during the legislative session as a member of the public.  Therefore, the policy's access restrictions are more akin to the

building permitting scheme in *The Tool Box* rather than the restriction on distribution of a message (newspaper circulation) in *City of Lakewood*.

Government restrictions that only incidentally regulate expression are not amenable to facial prior-restraint attacks. *See The Tool Box*, 355 F.3d at 1242–43. Although the Legislature might look to Schott's speech to determine whether he is "reputable," that does not mean the policy regulates expression or conduct associated with expression. *Id.* (permitting scheme did not regulate expression even though the city looked to the building applicant's speech to determine whether it was "wholesome"); *cf. id.* at 1244 (Porfilio, J., dissenting) ("That the City made its decision on the basis of protected speech is not even in controversy here. Nude dancing is protected expression, even if marginally so. Additionally, an analysis of the Covenants themselves underscores that the Tool Box permit was denied because the ruling officials believed, without statutory direction, nude dancing is not 'wholesome.'"). Because the policy regulates access, it does not have a "close enough nexus to expression" and Schott cannot raise a facial prior-restraint challenge. *City of Lakewood*, 486 U.S. at 759. *See id.* at 761 ("[A] law requiring building permits is rarely effective as a means of censorship. To be sure, on rare occasion an opportunity for censorship will exist, such as when an unpopular newspaper seeks to build a new plant. But such laws provide too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse.").

Nor does the policy "permit" the Legislature to make credentialing decisions "on the basis of ongoing expression . . . ." *Id.* at 761. "[W]hen the Court [in *City of*

*Lakewood*] refers to licensing laws that 'permit' decisions to be made on the basis of expression, it must be referring to laws that *by their explicit language* affirmatively permit expression-based decisions." *The Tool Box*, 355 F.3d at 1243 (emphasis added). *See id.* ("Perhaps one could say that the covenants are vague enough that they could be used to deny a license (a building permit) because of ongoing or anticipated expression. But that is not what the *Lakewood* Court meant by the quoted language.").

Although the media credentialing policy here does grant the Legislature wide discretion (it can deny a pass "for any reason"), and some of its exclusionary terms (*e.g.*, "reputable" or "ethics") are vague and subjective, the policy does not *explicitly* permit expression-based decisions. Thus, it does not permit credentialing decisions based on ongoing expression.

In sum, the policy is a law of general application that is not aimed at free expression or expressive conduct, and it does not permit credentialing decisions to be made on the basis of ongoing expression. Schott's prior-restraint challenge therefore fails. He does not allege the Legislature used its unbridled discretion to *arbitrarily deny him* a press pass (*e.g.*, "for any reason"); he alleges the policy *as written* excluded him. *See id.* at 1243 ("Nothing prevented Tool Box from bringing an as-applied [prior-restraint] challenge to the Mayor's decision; it simply chose not to.").

The district court did not err in dismissing Schott's facial prior-restraint claim.

36

### E.    Vagueness

Schott alleges as his final claim that various terms within the media credentialing policy, such as "established," "reputable," "blog," "independent," and "freelance," are "unduly vague." App., Vol. I at 39.  As a result, he says that he "cannot understand how [he] could qualify for a press credential under these vague criteria." *Id.* at 40.

"Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment." *United States v. Williams*, 553 U.S. 285, 304 (2008).  Void-for-vagueness arises when the government "tak[es] away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).  "While a plaintiff faces a significant challenge to prove vagueness, . . . when a 'law interferes with the right of free speech or of association, a more stringent vagueness test should apply.'" *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1234 (10th Cir. 2023) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982)).

But "a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause . . . for lack of notice." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010).  "And he certainly cannot do so based on the speech of others." *Id.*

37

The Legislature contends that vagueness doctrine does not apply to the policy because it "is not a law and does not take away [Schott's] life, liberty, or property." Aple. Br. at 42. It claims Schott has "not provided any authority establishing that [vagueness] doctrine necessarily applies to credentialing policies like those at issue here." *Id.* (quotation marks omitted). Alternatively, the Legislature argues the policy is not vague. The district court dismissed this claim because it concluded the policy was not vague and thus did not address the Legislature's first argument.

To begin with, we do not see why void-for-vagueness could *not* apply to the policy here—it is a government restriction, and it implicates a liberty interest. *See, e.g.*, *Sherrill v. Knight*, 569 F.2d 124, 130–31 (D.C. Cir. 1977) ("[T]he interest of a bona fide Washington correspondent in obtaining a White House press pass is protected by the first amendment. This first amendment interest undoubtedly qualifies as liberty which may not be denied without due process of law under the fifth amendment.").

But we need not address either issue: Schott's void-for-vagueness claim fails before it begins. Although he styled his complaint as an as-applied vagueness challenge, the policy clearly applied to Schott; he even acknowledged that he anticipated the new 2025 policy would "shut [him] out." App., Vol. II at 264 & n.136. *See also* App., Vol. I at 35 (alleging the Legislature revised its policy specifically intending "to target" him). Schott thus understood the policy excluded him, and he cannot raise a vagueness claim based on the speech of others. *See Humanitarian L. Project*, 561 U.S. at 20.

38

We therefore affirm the district court's dismissal of his vagueness claim.

## III.    Conclusion

For these reasons, we reverse the district court's dismissal of Schott's facial and as-applied viewpoint claims and remand for further proceedings on those counts consistent with this opinion.  We reverse the district court's denial of the preliminary injunction motion as moot on those claims.  We affirm the district court's dismissal of Schott's retaliation, prior-restraint, and vagueness claims.

25-4124, *Utah Political Watch, Inc., et al. v. Musselman, et al.*

**TYMKOVICH**, Circuit Judge, concurring.

We are remanding to the district court for it to review Schott's facial viewpoint claim. I write separately, however, to share several observations on whether the policy is facially viewpoint-based and to discuss the role that history and tradition might play in making that determination.

The district court briefly addressed the merits of Schott's facial claim when it denied his motion for a TRO. It concluded "[t]he legislature's 2025 credentialing policy draws no distinctions based upon the viewpoint of the speaker" because "[t]he criteria do not govern what can be published, but how information is disseminated." *Id.* at 91–92.

But as we outlined, viewpoint covers more than an individual's particular thoughts and ideas on a given topic; it also covers his decision on "*how* best to speak" and express those ideas. *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (emphasis added) (quotation marks omitted). For example, in *Matal v. Tam* the Supreme Court held the Lanham Act's bar on granting disparaging trademarks was viewpoint discrimination because "[g]iving offense is a viewpoint." 582 U.S. 218, 243 (2017). "The First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side." *Id.* at 249 (Kennedy, J., concurring). "It protects the right to create and present arguments for particular positions *in particular ways*, as the speaker chooses." *Id.* (emphasis added). And when the exclusionary term of a government policy "distinguishes between two opposed sets

40

of ideas," it "results in viewpoint-discriminatory application." *Iancu v. Brunetti*, 588 U.S. 388, 395 (2019). *See id.* at 394 (holding the Lanham Act's bar on "immoral or scandalous" trademarks to be "viewpoint-based").

The media credentialing policy's blanket exclusion of independent media appears to me to be viewpoint-based because it bars access based on a journalist's editorial choice to speak in an unedited and institutionally unaffiliated manner. *See Baumgartner v. United States*, 322 U.S. 665, 673–74 (1944) (Frankfurter, J.) ("One of the prerogatives of American citizenship is the right to criticize public men and measures—and that means not only informed and responsible criticism but *the freedom to speak foolishly and without moderation*." (emphasis added)). This "independent" viewpoint is opposed to a moderated and corporately affiliated perspective and mode of speech. Thus, a journalist from an independent media organization communicates his ideas through his own unfiltered viewpoint by choosing not to be subject to anyone else's editorial control.

Additionally, the policy's terms that exclude journalists from organizations that are not "reputable" and journalists that do not follow a code of "ethics" are strikingly similar to the Lanham Act's doomed "immoral or scandalous" criterion. *See Iancu*, 588 U.S. at 394 (noting "a typical definition" of the viewpoint-based term "scandalous" is "disreputable" and finding the restriction against "immoral"—*i.e.*, unethical—speech to be viewpoint-based). The Legislature's policy thus "distinguishes between two opposed sets of ideas: those aligned with conventional moral standards [(*i.e.*, a code of "ethics")] and those hostile to them; those inducing

41

societal nods of approval [(*i.e.*, "reputable")] and those provoking offense and condemnation." *Id.* "The [policy] favors the former, and disfavors the latter"—categorically placing independent media in the disfavored set of ideas. *Id.* Under this distinction, the policy seemingly permits the government to act as the arbiter of whether a news organization's speech is reputable or ethical. That, however, would be something the government cannot do. *See Iancu*, 588 U.S. at 400 (Alito, J., concurring) ("[A] law banning speech *deemed by government officials* to be 'immoral' or 'scandalous' can easily be exploited for illegitimate ends." (emphasis added)); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (government officials cannot "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion").

The Legislature nevertheless insists its policy is neutral because it merely imposes *speaker*-based restrictions and thus excludes disreputable and unethical speakers, not speech. *See* Aple. Br. at 29 ("[The policy's] criteria are 'based on the *status* of the respective' credential holder 'rather than their views.'" (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 49 (1983))).

But "[c]haracterizing a distinction as speaker based is only the beginning—not the end—of the inquiry." *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015). A speaker-based restriction is unconstitutional if "[i]n its practical operation" it engages in the "official suppression of ideas." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391, 395 (1992); *see also Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 645 (1994)

42

("[S]peaker distinctions" cannot be used as "a subtle means of exercising a [viewpoint] preference . . . .").

I am skeptical that the Legislature's speaker-speech distinction holds up in practical application: For the Legislature to judge whether a speaker is "reputable" or "ethical," it must evaluate the speaker's *speech*. Is UPW disreputable because Schott does not have "an editor and is the final arbiter and executioner of his stories"; or is UPW disreputable because Schott's speech is unedited, unmoderated, and conveyed in a "stream of consciousness" manner? App., Vol. I at 26. The Legislature's speaker-speech distinction seems to be one without a difference: A news organization is "reputable" *because* of its speech. *See Chiles*, 146 S. Ct. at 1023 ("The First Amendment is no word game. And the rights it protects cannot be renamed away or their protections nullified by mere labels." (internal quotation marks omitted)); *cf. Carson v. Makin*, 596 U.S. 767, 788 (2022) ("[A]ny status-use distinction lacks a meaningful application not only in theory, but in practice as well.").

And my conclusion that the policy appears to be viewpoint-based is buttressed by the First Amendment's adoption history and the founding traditions it furthered.

The Supreme Court has recently incorporated an analysis of history and tradition into its doctrine on various constitutional issues. *See, e.g.*, *United States v. Texas*, 599 U.S. 670 (2023) (Article III standing); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) (Establishment Clause); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) (Second Amendment). But the Court has not explicitly extended such analysis of the original meaning of the Speech and Press Clauses to its First

43

Amendment jurisprudence. Some scholars argue this might be because "[a]fter a century of academic debate, . . . the meanings of speech and press freedoms at the Founding remain remarkably hazy." Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246, 249 (2017).

Yet as recently as *Vidal v. Elster*, 602 U.S. 286 (2024), the Court relied on a historical analysis to decide a free speech case. *See* 602 U.S. at 296 (holding the long history and tradition of content-based restrictions for the Names Clause of the Lanham Act justified its constitutionality). But because a majority of the Court could not agree whether its historical analysis was a *required* part of its decision, it remains unclear exactly what role history and tradition now plays in free speech doctrine. *See id.* at 311 (Kavanaugh, J., concurring in part) ("In my view, a viewpoint-neutral, content-based trademark restriction might well be constitutional even absent such a historical pedigree."); *id.* (Barrett, J., concurring in judgment) ("[T]he Court never explains why hunting for historical forebears on a restriction-by-restriction basis is the right way to analyze the constitutional question.").

What is clear, however, is that history and tradition may *inform* the answer to constitutional questions. Neither party meaningfully addresses the topic but Amici devote much of their briefs to history and tradition. They persuasively argue that in enacting the Speech and Press Clauses, the Framers were concerned that the government might attempt to control the press—a term originally understood to protect what we might now call independent journalists. *See* Eugene Volokh, *The Freedom of Speech and of the Press Clause, in* The Heritage Guide to the

44

Constitution 602 (3d ed. 2025) ("[T]he Free Press Clause . . . was enjoyed by *all* who used printing presses to communicate to the public at large. . . . Professional publishers and journalists were not seen as having any more constitutional rights than everyone else had." (emphasis added)).

For example, the history of the Press Clause shows that it created a "broad right [for] '*every citizen*' to publish his sentiments . . . , since at the time of the founding there were no professional journalists in the modern sense of the word." Michael W. McConnell, *Reconsidering Citizens United as a Press Clause Case*, 123 Yale L.J. 412, 436 (2013) (emphasis added).

> The Federalist—written by three non-journalists and published in New York newspapers as occasional essays—is the most famous example, but there were hundreds of others. When the Founders spoke of the importance of "the press," they were not talking about professional news media, but about the printing press, meaning the ability of people to disseminate ideas easily and inexpensively to a broad public. The licensing of the press, which was the great evil against which the Amendment was directed, applied to books and pamphlets as much as to newspapers. Indeed, pamphlets were among the most important publications for the influencing of public opinion. Thomas Paine's Common Sense, which he self-published, is a famous example. . . . To confine freedom of the press to professional journalism . . . would require shrinking—"abridging"—the scope of the Clause, making its coverage narrower than at the time of the Framing.

*Id.* at 436–38. And another scholar cites historical evidence to argue that viewpoint discrimination by the government *against all individuals* has always been disfavored. *See* Campbell, *supra*, at 255–56. ("[T]he Founders widely thought that the freedom to make well-intentioned statements of one's views belonged to a subset of natural

rights, known as 'unalienable' natural rights, that could not be restricted in promotion of the public good and thus fell outside legislative authority to curtail.").

The history of the controversial Sedition Act of 1798 also reinforces my conclusion that the First Amendment does not permit the government to judge the legitimacy of the media. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 276 (1964) ("Although the Sedition Act was never tested in this Court, the attack upon its validity has carried the day in the court of history."). The Sedition Act made it a crime to "publish[] any *false*, *scandalous* and malicious writing or writings against the government . . . ." 1 Stat. 596 (1798) (emphasis added) (expired 1801). James Madison, the main drafter of the First Amendment, argued the Act was unconstitutional. *See* James Madison, *The Report of 1800*, National Archives (Jan. 7, 1800) ("[The Sedition Act] exercises a power not delegated by the constitution."). Thomas Jefferson described the Act as a constitutional "nullity as absolute and as palatable as if Congress had ordered us to fall down and worship a golden image . . . ." Thomas Jefferson, *Letter to Abigail Adams*, National Archives (July 22, 1804). Like the concerns around the Sedition Act, Utah's media credentialing policy appears to hand the government the power to engage in viewpoint discrimination by evaluating the truth and legitimacy of a journalist's speech.

Amici also contend there is a long tradition in this country of allowing media access—free from government-determined, viewpoint-based access requirements—to legislative sessions. For example, in the First Congress, Representative Burke introduced a resolution to remove journalists from the House floor who allegedly

46

"misrepresented" debates.  1 Annals. of Cong. 952 (1789).  Other congressional members sharply criticized Burke's proposal.  *See, e.g.*, *id.* at 954 (Representative Hartley described it as "an attack upon the liberty of the press"); *id.* at 955 (James Madison argued it was "improper to throw impediments in the way of such information as the House had hitherto permitted").  Burke withdrew his resolution, and ultimately, Congress concluded it was best to leave it to reporters themselves to determine "the admission of such persons as thought themselves qualified . . . ."  *Id.* at 1097.  *See also* Sarah Eckman, Cong. Rsch. Serv., R44816, Congressional News Media and the House and Senate Press Galleries 1 (2017) ("Reporters have covered Congress since its earliest sessions. . . .  By the middle of the 1800s, each chamber had established its own designated reporters' gallery space.  In 1877, the House and Senate decided to create a committee of correspondents to oversee press gallery membership and administration.").

The Legislature has not argued that any countervailing history or tradition justifies its policy.  And though my brief historical analysis may not ultimately control the viewpoint determination, I note that the histories and traditions of the Speech and Press Clauses add weight to my initial conclusion that the media credentialing policy is unconstitutional on its face.